UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ASHLEY BEARDS, DMD and ELAINA BERD-
VERGIER DDS,

                                        Plaintiffs,

                    -v-

BRONXCARE HEALTH SYSTEM f/k/a BRONX
LEBANON HOSPITAL and PAUL GATES, DDS,

                                        Defendants.

18 Civ. 12216 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Plaintiffs Dr. Ashley Beards, DMD ("Beards"), and Dr. Elaina Berd-Vergier, DDS

("Berd-Vergier"), here allege that defendants BronxCare Health System ("BronxCare") and Dr.

Paul Gates, DDS, ("Gates"), in terminating them, discriminated against them on the bases of race

and religion, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended*

42 U.S.C. § 2000e *et seq.*, New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code

§ 8-101 *et seq.*

Defendants have moved for summary judgment on all claims.  For the reasons that

follow, the Court grants defendants' motion.

## I.     Background

### A.     Factual Background[1]

#### 1.     BronxCare and the Dental Department

BronxCare is the largest non-profit healthcare system serving the South and Central

Bronx.  JSF ¶ 1.  Its dental department has six locations in Bronx County.  *Id.* ¶ 2.  BronxCare is

also a teaching hospital that offers residency programs, including in dentistry.  *Id.* ¶ 4.  As such,

attending dentists have certain duties to educate and supervise residents.  *Id.* ¶ 5.  Gates has

served as Chairman of the dental department between 1990 and August 28, 2019, when he

retired.  *Id.* ¶¶ 9–10.  In addition to Gates, at all relevant times, the Dental Department

Management Council ("Management Council") comprised Dr. Jewan Singh ("Singh"), Director

of Clinics and site supervisor, Viva Rivera ("Rivera"), Practice Administrator, and Dr. Fadel

---

[1] This factual account draws primarily from the parties' submissions in support of and in opposition to defendants' motion for summary judgment, including the Joint Statement of Undisputed facts, Dkt. 38 ("JSF"), defendants' Rule 56.1 statement, Dkt. 51 ("Def. 56.1"), plaintiffs' Rule 56.1 response statement, Dkt. 58 ("Pl. 56.1"), and the declarations (some with accompanying exhibits) of Jewan Singh, Dkt. 43 ("Singh Decl."), Daniel LaRose, Dkt. 44 ("LaRose Decl."), Paul Gates, Dkt. 45 ("Gates Decl."), Marc Brown, Dkt. 46 ("M. Brown Decl."), Denny Chern-Kelk, Dkt. 47 ("Chern-Kelk Decl."), Viva Rivera, Dkt. 50 ("Rivera Decl."), Ashley Beards, Dkt. 55 ("Beards Decl."), Martin Kimmel, Dkt. 56 ("Kimmel Decl."), Elaina Berd-Vergier, Dkt. 57 ("Berd-Vergier"), Vincent Bauer, Dkt. 59 ("Bauer Decl."), and Howard Weiner, Dkt. 62 ("Weiner Decl.").

Citations to a party's Rule 56.1 statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Carcamo ("Carcamo").  *See* Singh Decl. ¶¶ 4, 25; Rivera Decl. ¶¶ 1, 23; Def. 56.1 ¶ 33; Pl. 56.1

¶ 33.[2]

### 2.    Ashley Beards

#### a.    *Background*

Beards is a Jewish, Caucasian male.  JSF ¶ 11.  He attended dental school at Fairleigh

Dickinson University ("FDU"), where he met Gates, who worked at FDU between 1973 and

1989.  *Id.* ¶¶ 7–8, 12.  In 2006, Beards applied to be an attending dentist at BronxCare.  *Id.* ¶ 23;

Beards Decl. ¶ 2.  Gates interviewed Beards and, on April 1, 2006, hired Beards as an attending

periodontist.  Gates Decl. ¶ 4; JSF ¶¶ 22–23; Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.  Gates was aware at the

time of the hire that Beards was Jewish and white.  Gates Decl. ¶ 5.

Before starting at BronxCare, Beards had a private dental practice, which, after joining

BronxCare, he maintained three and a half days per week.  JSF ¶ 14.  Although Beards started

working at BronxCare one day per week, in December 2007, he began working there two days a

week.  *Id.* ¶¶ 24–25; Beards Decl. ¶ 3.  In April 2010, he began working at BronxCare three days

a week, at which point he closed his private practice.  JSF ¶ 15; Beards Decl. ¶ 3.  In 2013,

Beards was offered a full-time attending position, but he declined the position and continued

working three days a week at BronxCare.  JSF ¶¶ 26–27.  Beards continued working three days

per week at BronxCare until his termination.  *Id.* ¶ 27.  Since his termination, Beards has not

attempted to reopen his private practice.  *Id.* ¶ 16.

#### b.    *Discrimination at BronxCare*

Beards claims that Gates made numerous derogatory comments about Jews in front of

Beards and other dentists.  Beards claims that between 2006 and 2017, Gates would stop by

---

[2] The summary judgment record as furnished to the Court does not disclose the race or ethnicity
of any of these persons, including Gates.

Beards's operatory and would occasionally tell Beards derogatory jokes about Jews. *See* Beards Decl. ¶ 6. Although Beards was offended by these jokes, he felt that his job depended on his not reacting to them and so did not report them. *Id.* ¶ 7. Beards contends that Gates told such jokes four or five times throughout Beards's tenure at BronxCare, the latest occurring in September 2017. *Id.* ¶ 6. After this last joke, Beards alleges, Gates told Beards that he was glad the two were alone in an elevator because Gates could be in big trouble had anyone heard the comment. *See id.* ¶ 8. Dentist Dr. Martin Kimmel alleges that, in or around 2016, upon trying to shake Gates's hand, Gates asked him why Kimmel would want to shake his hand, stating that "[Kimmel] was the master, and [Gates] was the slave." Kimmel Decl. ¶ 6. Kimmel reportedly responded that Jews had been slaves 4,000 years ago. *Id.*

Beards also contends that the recruiting and hiring practices at BronxCare reflected bias against white and Jewish candidates. Beards estimates that 90% of the resident applicants were ethnic minorities, and attributes this to Gates's actively recruiting minority candidates. *See* Beards Decl. ¶ 9. When white candidates did apply, Beards alleges, they were scrutinized more rigorously than ethnic-minority candidates. *Id.* ¶ 10. Beards claims that an orthodox Jewish candidate requested Friday afternoons and Saturdays off, offering to make up for the time in other ways, but Beards heard Director of Clinics Singh say in a "derogatory tone" that "no accommodation should be made, and that the candidate should apply somewhere else." *Id.* With respect to hiring attending dentists, Beards alleges that most minority attending dentists were hired directly from the residency program and had very little experience. *See id.* ¶ 16.

Beards also claims that at various meetings and upon introducing himself to new residents each year, Gates would describe the BronxCare dental residency as a "residency program for minorities," and one that is "run by a minority, with minority faculty teaching

minorities." *Id.* ¶ 11.  Beards claims that Gates made similar statements approximately 10 times throughout Beards's tenure, with the last being in July 2017.  *Id.*  He further alleges that Gates would describe the dental residency program as an "all minority" one to guests.  *Id.*  Beards alleges that the last of these statements was made in July 2017.  *Id.*  Defendants dispute that these statements were made.  *See, e.g.*, Weiner Decl. ¶ 8.

Beards also claims that he and other white, Jewish attending dentists experienced discriminatory treatment in obtaining support from assistants and residents.  When the clinic was short on assistants or residents, assistants and residents were taken first from the white attending dentists.  Beards Decl. ¶ 12.  Beards alleges that white, Jewish attending dentists were told that they had to share assistants and residents but that, once the assistant or resident was given to another attending physician, it was almost impossible to get them back.  *Id.* ¶ 13.  Beards cannot remember a single instance in which an assistant or resident was taken from a minority attending physician before a white one.  *Id.*  The removal of such assistance required Beards to stay late to complete his paperwork.  *Id.* ¶ 14.  Relatedly, Beards alleges that minority attending dentists were given time to complete paperwork during clinic hours, when they were supposed to be seeing patients, but that when Beards asked for the same opportunity, he was denied.  *Id.* ¶ 15.

Beards further contends that he and other white, Jewish dentists experienced discriminatory treatment as to scheduling.  Beginning around 2015, Beards's appointments, which he had previously made himself, were booked by the front desk.  *Id.* ¶ 17.  From this point, his periodontal consultations, which last an hour or more, were double- and tripled-booked, a pace which Beards's residents could not sustain.  *See id.* ¶ 18.  Defendants dispute that this multiple-booking approach was discriminatory and attest that it was an attempt to combat the

impact of BronxCare's high no-show rate. *See* Bauer Decl., Ex. 9 ("Singh Dep. Tr.") at 50.[3]

Beards contends that when he complained about this approach, he was told that with two

assistants and two residents per shift, he could handle the multiple bookings, despite the fact that

he was assigned only one assistant and one resident. *See* Beards Decl. ¶¶ 20–21. Beards claims

that only plaintiffs and Howard Weiner, a white, Jewish endodontist who has not joined this

lawsuit, experienced this understaffing treatment. *Id.* ¶ 21. However, Weiner attests that he was

not understaffed any more or less than any other dentist in the practice, regardless of race.

Weiner Decl. ¶ 6. Finally, Beards argues that plaintiffs and Weiner were rarely assigned

Spanish-speaking attendants, while such assistants were assigned to Spanish-speaking doctors.

Beards Decl. ¶ 22. Weiner disputes this and claims that he was assigned Spanish-speaking

assistants no differently than any other doctor, regardless of race. Weiner Decl. ¶ 7.

At no time during his employment at BronxCare did Beards report or complain of any

discrimination to any BronxCare supervisor, administrator, or HR employee. JSF ¶ 31.

### c.   *Performance Issues at BronxCare*

Beards suffered productivity issues beginning in 2014. In 2014, Singh met with Beards

because Singh believed that Beards was scheduling an inadequate number of patients. Singh

Decl. ¶ 5; *id.*, Ex. A at 1 (Beards disciplinary record); Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.[4] After 2015,

---

[3] Certain pages from Singh's deposition that plaintiffs cite in their Rule 56.1 response statement
were omitted from the Exhibit 9 of the Bauer Declaration. These pages are docketed at
Dkt. 64-2. For simplicity, the Court will refer to all pages from Singh's deposition attached as
exhibits to dockets 9 and 64 as "Singh Dep. Tr."

[4] In their opposition, plaintiffs claim that "Dr. Singh admitted that he did not know whether Dr.
Beards received any feedback at all in terms of his productivity *in or before* 2016." Dkt. 54
("Pl. Opp'n") at 21 (emphasis added) (citing Singh Dep. Tr. at 45). That is a mischaracterization
of Singh's testimony. In the testimony to which plaintiffs cite, Singh stated that he did not know
if anyone in 2016 spoke to Beards about productivity that year, the year before he was
terminated. *See* Singh Dep. Tr. at 45 ("Q. *In 2016* do you know whether Dr. Beards himself was

Beards did not see as many patients per day as the two other periodontists on staff at BronxCare, Dr. De La Hoz and Dr. Sheinberg. *See* Singh Decl., Ex. B at 13–28 (report of Beards patients seen between 2011 and 2017), 29–38 (report of De La Hoz patients seen between 2015 and 2019), 39–52 (report of Sheinberg patients seen between 2013 and 2019); Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.  In 2016, adjusting for the number of clinic days each worked, Beards saw 174 patients, De La Hoz saw 214, and Sheinberg saw 206.[5]  *See* Singh Decl., Ex. B at 25–26 (Beards saw 522 patients in 2016), 31–32 (De La Hoz saw 357 patients in 2016), 43–44 (Sheinberg saw 103 patients in 2016); Rivera Decl. ¶¶ 31–33 (Beards worked three days per week in 2016; De La Hoz worked one day per week until May 2016 and then worked two days per weeks; and Sheinberg worked one half-day per week in 2016).  By this measure, De La Hoz was thus approximately 23% more productive per day worked than Beards, and Sheinberg was approximately 18% more productive than Beards.  Further, the number of patients that Beards saw declined each year, although he continued to work three days per week.  Beards Decl. ¶ 3. Beards saw 711 patients in 2015, 522 patients in 2016, and 398 patients in 2017 (until his termination in October 2017).  Def. 56.1 ¶¶ 8–10; Pl. 56.1 ¶¶ 8–10.  De La Hoz and Sheinberg did not have similar drops in productivity.  Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.

---

given any feedback with regard to his relative productivity as an attending *that year*?  A. I don't know." (emphasis added)).  The claim that no one spoke to Beards about his productivity in or before 2016 is belied by plaintiffs' response to defendants' Rule 56.1 statement.  *See* Pl. 56.1 ¶ 6 (admitting that in 2014, Singh spoke with Beards about not scheduling an adequate number of patients).

[5] These numbers are calculated by dividing each dentist's annual number of patients by the number of days per week each worked at BronxCare.  *See* Dkt, 42 ("Def. Mem.") at 18; Dkt. 60 ("Def. Reply") at 2.  Converting these numbers to average number of patients per day, Beards saw approximately 3.3 patients, De La Hoz saw approximately 4.1, and Sheinberg saw approximately 4.0.

Beards concedes that his productivity became an issue at the end of his tenure but attributes the decline to a 50% no-show rate at BronxCare.  *See* Singh Dep. Tr. at 48–49 (acknowledging that no-shows were a problem in the dental department but not the fault of Beards), 95 (no-show rate averaged 50% in the dental department).  Singh testified that the no-show rate was the "chief cause" of Beards's lack of productivity.  *Id.* at 50.  Beards also attributes the decline to support staff's inconsistent implementation of BronxCare's policy to call his patients and remind them of their appointments, as well as Singh's refusal to provide additional clinical assistance or implement Beards' suggestions, including to provide him with enough assistants and residents.  Beards Decl. ¶¶ 5, 19.  Beards further claims that responsibility for his schedule was taken away from him in 2015, also contributing to his decline in productivity.  *Id.* ¶ 17.  However, as defendants note, Singh testified that his attempts to schedule more patients for Beards, so as to combat the no-show problem, were met with "significant resistance" from Beards, Singh Dep. Tr. at 50, and Beards himself testified that starting in 2015, when he was no longer able to control his appointments, his schedule became "totally unreasonable," due to a combination of double- and triple-booking appointments and the failure of Beards's assistants to call and remind patients of their appointments.  Beards Decl. ¶¶ 17–19. The parties contest whether BronxCare failed to adequately assign him residents and assistants, in particular Spanish-speaking assistants, and the extent to which this harmed his productivity. *Compare id.* ¶¶ 19–22, *with* Weiner Decl. ¶¶ 6–7.

Defendants also attest that Beards exhibited conduct and attitude problems while at BronxCare.  In 2014, a BronxCare staff member complained that Beards had been rude to the call center, and Beards, Singh, and Rivera held a meeting with the staff member to discuss this complaint.  *See* Singh Decl. ¶ 12; *id.*, Ex. A at 7 (Beards disciplinary record); Rivera ¶ 11; *see*

*also* Def. 56.1 ¶¶ 15–16; Pl. 56.1 ¶¶ 15–16.  That same year, a patient called Gates's office to complain that Beards had been rude to and screamed at the patient.  *See* Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.  In January 2015, Beards received a second complaint related to a comment that Beards had made about the state of a patient's mouth.  The parties dispute whether Beards told the patient that the patient's mouth was a "garbage can" or whether Beards described the mouth in general as a "garbage pail" that must be kept free of debris.  *See* Def. 56.1 ¶ 17; Singh Decl., Ex. A at 7–9 (Beards disciplinary records); Gates Decl. ¶ 10; Singh Decl. ¶ 10; LaRose Decl., Ex. F at 29–30 (excerpt of Gates deposition testimony); Pl. 56.1 ¶ 17; Dkt. 64, Ex. 1 at 15–16 (Beards's testimony that he told the patient the mouth was like a garbage pail and hers had a lot of debris); Singh Dep. Tr. at 66–67 (Singh testimony that he cannot recall whether Beards told the plaintiff that "the mouth is like a garbage can" or "your mouth is [like] a garbage can").  The parties dispute whether, as a result of this complaint, Beards was placed on a three-month probationary period.  *See* Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.  Defendants further claim that Beards would refuse to see patients who arrived late, which caused other dentists to have to fit those patients into their schedules.  *See* Gates Decl. ¶ 11; Singh Decl. ¶ 13; M. Brown Decl. ¶ 8. Beards maintains that he followed BronxCare's policy for late patients.  *See* Pl. 56.1 ¶ 24; Singh Dep. Tr. at 83–85 (Singh testimony that although the policy is that patients have a 30-minute grace period, every effort should be made to accommodate the patient).  More generally, several attending dentists filed declarations attesting that Beards was difficult to work with.  *See* Gates ¶ 9; Singh ¶ 9; M. Brown Decl. ¶ 7; Chern-Kelk Decl. ¶ 5; *see also* Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23. The parties dispute, however, whether doctors complained about Beards to Rivera and Singh. *Compare* Rivera Decl. ¶ 12, *and* Singh Decl. ¶ 15, *with* Pl. 56.1 ¶¶ 22, 31.

Defendants describe Beards as "inflexible" about assistants and residents, and Singh attests that Beards "blocked" other dentists from using his assistants or residents.  *See* Singh ¶ 14.  But Beards counters that only white attending dentists were expected to share assistants and residents, and that once an assistant or resident was taken from an attending dentist, it was impossible to regain that staff member, forcing the affected attending dentist to work late.  *See* Beards Decl. ¶ 13.  In June or July 2017, when Singh was not in the clinic, Beards engaged in a "verbal altercation" with Dr. Sullivan ("Sullivan"), a black attending dentist, about Sullivan's request to use Beards's assistant to take an x-ray.  *See* Def. 56.1 ¶ 19; Singh Decl. ¶ 11; *id.*, Ex. A at 12 (Beards disciplinary records); Beards Decl. ¶ 24.  This particularly troubled Singh because Sullivan was in charge when Singh was absent.  *See* Singh Decl. ¶ 11.  Beards describes this as a "single disagreement," Pl. 56.1 ¶ 19, and notes that BronxCare dentists are not permitted to take another dentist's assistant or resident if that dentist is in the middle of a surgical procedure, which Beards contends he was, *see* Beards Decl. ¶¶ 24–25.  Sullivan filed a complaint about the incident with Singh, and Singh, Sullivan, and Beards had a discussion about it.  *See* Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.  Defendants contend that, in general, Beards was possessive of residents and would attempt to stop other dentists from using those he used.  *See* Singh Decl. ¶ 14; Chern-Kelk Decl. ¶ 6.  Defendants allege that Kimmel once complained to Singh that Beards would not let him use patient rooms that were assigned to Beards, even if not in use.  *See* LaRose Decl., Ex. G at 71 (excerpt of Singh deposition).

However, Beards attests that, in his capacity as a faculty member of the resident program, he received only one official faculty-performance-evaluation conference, which was conducted in September 2017, *see* Beards Decl. ¶ 26, one month before he was terminated.  In this evaluation, Gates expressed happiness with his performance and showed him the residents'

review of him, which were "top rated," although Beards was not given any other written evaluation of his performance.  *Id.*  Moreover, none of Beards's performance evaluations contain any significant issues, *see* Bauer Decl., Ex. 1 (Beards's performance evaluations for 2014–2016), and in blind feedback from residents, Beards was rated highly, *see id.*, Ex. 2 (resident feedback of Beards from 2014–2017).

### 3.   Elaina Berd-Vergier

#### a.   Background

Berd-Vergier is a Jewish, Caucasian female.  JSF ¶ 17.  She studied and conducted her residency at University of Medicine and Dentistry of New Jersey, which has since dissolved and is now part of Rutgers University.  *Id.* ¶ 18.

In 2012, Berd-Vergier applied to be an attending dentist at BronxCare.  *Id.* ¶ 32.  She was interviewed by Gates and, on July 23, 2012, hired by BronxCare as an attending prosthodontist. *Id.* ¶¶ 33–34.  Gates was aware at the time of the hire that Berd-Vergier was white and became aware that she was Jewish within six months.  Gates Decl. ¶ 5.  While at BronxCare, Berd-Vergier worked 2.5 days per week.  JSF ¶ 26.  During her time at BronxCare, Berd-Vergier was the only prosthodontist on staff.  *See* LaRose Decl., Ex. E ("Berd-Vergier Dep. Tr.") at 52.

Before starting at BronxCare, Berd-Vergier had a private practice.  JSF ¶ 19.  Berd-Vergier continued her private practice while working at BronxCare and has maintained the practice since her termination.  *Id.*

#### b.   Discrimination at BronxCare

Berd-Vergier began experiencing problems in the first six months on the job.  She contends that there was no proper scheduling, that she did not have a dental assistant assigned, and that residents were not able to adequately participate in the prosthetic program.  *See* Berd-Vergier Decl. ¶ 2.  Singh, she claims, was reluctant to leverage Berd-Vergier's clinical skills,

gained from a 12-year career, to develop a prosthodontic protocol and to create a systematic approach to the prosthodontic clinic.  *Id.* ¶¶ 3–4.  This made it difficult for Berd-Vergier to get the necessary tools and equipment.  *Id.* ¶ 4.

In April 2014, the main clinic for the dentistry department was moved from 1770 Grand Concourse to 1175 Grand Concourse.  JSF ¶ 3.  Berd-Vergier requested but was not given a key fob to the administrative offices at the new building; the parties contest the extent to which this affected her work.  *Compare* Rivera Decl. ¶ 18 (claiming that key fobs to the administrative offices were given only to those with offices there, but that Berd-Vergier "demanded" one), *with* Berd-Vergier Decl. ¶ 5 (claiming that defendants' failure to provide her with a key fob to the administrative offices "hampered" her ability to do her job).  Unlike minority residents and auxiliary staff, Berd-Vergier was not given a permanent locker at the 1775 Grand Concourse location staff, but was assigned only a temporary locker, which she had to empty each day, which she found "humiliating."  *Id.* ¶ 6.  Defendants argue that Berd-Vergier was not given a permanent locker because she did not work full time at that location.  *See* Rivera Decl. ¶ 19.  She did not, however, have locker issues at the old location.  *See* Berd-Vergier Dep. Tr. at 109.  Berd-Vergier further claims that her requests for a supply cabinet with a lock to keep her professional materials were ignored.  Berd-Vergier Decl. ¶ 6.  Defendants characterize these requests as requests for special treatment that evidence Berd-Vergier's "elitist attitude."  Rivera Decl. ¶¶ 15–19.

Berd-Vergier also claims that on approximately four occasions, at the annual gathering to introduce new residents and at Christmas parties, she heard Gates comment that the BronxCare dental department "was designed to educate minority residents, and that the goal was to treat minority patients, and for minority staff to be taught by minority attendings."  Berd-Vergier

Decl. ¶ 7.  She also alleges that Gates favored minorities in hiring and hired attendings with minimal or no experience straight from the BronxCare residency program.  *Id.*

At no time during her employment at BronxCare did Berd-Vergier report or complain of any discrimination to any BronxCare supervisor, administrator, or HR employee.  JSF ¶ 40.

###### c. *Performance at BronxCare*

In 2016 and 2017, Berd-Vergier's productivity began to suffer.  Between 2013 and 2015, Berd-Vergier saw an average of 1,000 patients per year.  Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12; Singh Decl., Ex. B at 1–12 (report of Berd-Vergier's patients seen between 2012 and 2017).  However, in 2016, Berd-Vergier saw only 625 patients, and between January and October 2017, she saw 393 patients.  *See* Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14; Singh Decl., Ex. B at 9–12.  Although Berd-Vergier concedes that her productivity declined, she argues that these numbers are a function of fewer referrals to her practice.  Beginning in 2015, the number of new patients referred to her began to decline:  Berd-Vergier was referred 81 new patients in 2014, 40 new patients in 2015, 4 new patients in 2016, and 4 new patients in 2017.  Berd-Vergier Decl. ¶¶ 12–13.  She claims that Singh never spoke to her about her productivity.  *Id.* ¶ 11.

Defendants further contend that Berd-Vergier exhibited problems with her attitude and unprofessional conduct.  Defendants attest that doctors have complained about Berd-Vergier to Rivera and Singh.  *See* Rivera Decl. ¶ 20.  Several attending dentists filed declarations stating that Berd-Vergier was difficult to work with.  *See* Gates ¶ 12; Singh ¶ 16; M. Brown Decl. ¶ 12; Chern-Kelk Decl. ¶ 8; *see also* Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32.  Chern-Kelk alleges that on multiple occasions, Berd-Vergier told her, disparagingly, that Chern-Kelk was the only Jewish doctor who was not a specialist.  Chern-Kelk Decl. ¶ 9.

Defendants also contend that Berd-Vergier exhibited unprofessional behavior in front of patients.  In 2015, a patient called Gates's office to complain that Berd-Vergier had yelled at her

students, and referred to Berd-Vergier as "a monster."  Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25; *see also*

Singh Decl., Ex. A at 2 (Rivera's report of the patient complaint).  The patient also complained

about Beards, and Rivera's notes include the following:  "What's going on with these Dentist[s]

that Dr. Gates is hiring."  Singh Decl., Ex. A at 2.  Defendants concede that this was the only

such complaint about Berd-Vergier, *see* Singh Dep. Tr. at 120, and that Gates did not fault her

dental work, *see* Dkt. 59-8 at 86 (excerpt of Gates deposition testimony).  Other dentists report

that Berd-Vergier was extremely particular about equipment and would refuse to see patients

when the lab or equipment was not exactly the way she wanted it, *see* M. Brown Decl. ¶ 13, and

that she would get visibly upset and yell in front of patients, *see* LaRose Decl., Ex. H at 20 (M.

Brown deposition testimony).

Defendants also depict Berd-Vergier as demanding special treatment.  She requested that

BronxCare purchase expensive equipment for her use.  Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.  They

construe her requests for a key fob to the administrative offices at 1775 Grand Concourse,

despite not having an office in the administrative offices, and her request for a permanent locker

in that location, despite not working full time, as seeking special treatment.  Rivera Decl. ¶¶ 15–19.

They similarly characterize her request for a supply cabinet or storage locker so that other

doctors could not access her equipment.  Berd-Vergier Dep. Tr. at 51–53; Rivera Decl. ¶ 17.

Berd-Vergier contends that her need for a storage locker was primarily for organizational

purposes and that she could not leave her things in the main room where the assistants left theirs

because it was not safe to do so.  Berd-Vergier Dep. Tr. at 51–53.  She further notes that her

requests for a key fob, permanent locker, and supply cabinet were made in 2015, long before she

was terminated, and that she did not renew these requests.  Berd-Vergier ¶¶ 5–6.  Berd-Vergier

requested time off during a period covered by a BronxCare policy that no attending dentists may

take vacation, *see* Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30, but she contends that others were permitted to take time off during this period, *see* Berd-Vergier Dep. Tr. at 50.

In the five years she worked for BronxCare, Berd-Vergier received only one performance evaluation: in March 2017.  Berd-Vergier Decl. ¶ 9.  She reports that in the evaluation, Gates provided only positive feedback and told her that her worked met his expectations.  *Id.* ¶¶ 9–10. Berd-Vergier further contends that at this evaluation Gates showed her wholly positive resident and peer reviews.  *Id.* ¶ 10.  She signed the evaluation at the end of the meeting.  *Id.* Performance evaluations for Berd-Vergier, beginning in 2013, were consistently positive, *see* Bauer Decl., Ex. 3 (Berd-Vergier's 2013, 2014, and 2016 performance evaluations conducted by Gates, and one undated evaluation), and she received positive reviews from residents, *see id.*, Ex. 4 (Berd-Vergier residents' reviews for 2014–2017).

### 4.    Plaintiffs' Terminations

In summer 2017, the Management Council—Gates, Singh, Rivera, and Carcamo—met. Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.  Singh, Rivera, and Carcamo recommended to Gates that Beards and Berd-Vergier be terminated.  Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33; JSF ¶¶ 28, 37.  Gates did not terminate either at that time.  In October 2017, both plaintiffs were terminated.  JSF ¶¶ 29, 38. Gates made the decision to terminate the two.  *Id.* ¶¶ 30, 39.  Beards was terminated on October 4, 2017; Berd-Vergier, on October 6, 2017.  *See* Beards ¶ 27; Berd-Vergier Decl. ¶ 14.

Beards was told his job was being "eliminated."  Beards Decl. ¶ 27.  In his place, Gates increased the hours of De La Hoz and Sheinberg, the other two periodontists on staff.  *See* Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.  Sheinberg is white and Jewish.  *See* Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.  Just prior to Beards's termination, Gates increased De La Hoz's time from two days per week to three.  *See* Rivera Decl. ¶ 32; Beards Decl. ¶ 23.  After Beards's termination, Gates tripled Sheinberg's time to 1.5 days a week.  *See* Rivera Decl. ¶ 33.

Gates did not immediately hire a replacement for Berd-Vergier. Plaintiffs contend that Berd-Vergier's work was initially assigned to Dr. Rick Adams, an African-American generalist dentist who is not a prosthodontist specialist. *See* Bauer Decl., Ex. 5 ("EEOC Resp.") at 2 (Berd-Vergier's EEOC petition and BronxCare's response). Defendants deny that Berd-Vergier's "line of service" work was shifted to Adams. *Id.*; *see also* Def. Reply at 6. Rather, defendants contend that Adams, along with other general dentists, handles prosthodontics cases "as needed" by the department. EEOC Resp. at 2. BronxCare is required to have a specialist in each area for accreditation purposes. *See* Berd-Vergier Decl. ¶ 15. Ten months after Berd-Vergier was terminated, and after Berd-Vergier filed her EEOC complaint, Gates hired Dr. Jerry Brown, a prosthodontist specialist who is white and Jewish. *See* Gates Decl. ¶¶ 24–25; J. Brown Decl. ¶ 3.

In the same year that he terminated Beards and Berd-Vergier, Gates terminated two other dentists: Dr. Tashorn Gomez and Dr. Jonathan Pong. Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41. Gomez is African-American, and Pong is Asian-American. Def. 56.1 ¶¶ 42–43; Pl. 56.1 ¶¶ 42–43. To Gates's knowledge, neither is Jewish. Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44. Beards and Berd-Vergier are the only two white, Jewish doctors that Gates has fired in his 29 years as chair of the BronxCare dental department. Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.

## B.   Procedural History

On January 14, 2019, plaintiffs filed the Complaint, claiming that each had been terminated on account of race and religion. Dkt. 4 ("Compl."). On March 22, 2019, BronxCare and Gates answered the complaint. Dkt. 11 ("Answer"). On December 19, 2019, the parties concluded fact discovery.

On January 10, 2020, the Court held a conference to discuss defendants' anticipated motion for summary judgment. On February 7, 2020, the parties filed their joint statement of undisputed facts. On March 6, 2020, defendants filed a motion for summary judgment, Dkt. 41,

with a supporting memorandum of law, Def. Mem., and declarations, Dkts. 43–50, and a Local

Rule 56.1 statement, Def. 56.1.  On April 24, 2020, plaintiffs filed an opposition to the motion

for summary judgment, Pl. Opp'n, declarations in support, Dkts. 55–57, 59, and a response to

defendants' Local Rule 56.1 statement, Pl. 56.1.  On May 15, 2020, defendants filed a reply, Def.

Reply, and declarations in support, Dkts. 61–62.

## II.    Legal Standards

### A.    Legal Standards Governing Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears the burden of demonstrating the absence of a question of material fact.  In

making this determination, the Court must view all facts "in the light most favorable" to the non-

moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion

for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).

Rather, to survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

"Only disputes over facts that might affect the outcome of the suit under the governing

law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986).  In determining whether there are genuine issues of material fact, a court is "required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted) (alterations omitted). Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## B.    Legal Standards Governing Plaintiffs' Discrimination Claims

### 1.    Title VII and the NYSHRL

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Similarly, the NYSHRL makes it an "unlawful discriminatory practice" for an employer, based on an individual's "race, creed, [or] color," "to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a).

18

Discrimination claims under both Title VII and the NYSHRL[6] are analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Holcomb*, 521 F.3d at 138.  To do so, the plaintiff must show that (1) she "belonged to a protected class"; (2) she "was qualified for the position [s]he held"; (3) she "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Holcomb*, 521 F.3d at 138).  The burden of establishing a *prima facie* case in an employment-discrimination case is "minimal."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019).

Where the plaintiff can demonstrate a *prima facie* case, "a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253–54 (1981)).  The burden of production then shifts to the employer to "'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (employer's burden is "one of production, not persuasion").

---

[6] In August 2019, the NYSHRL was amended to broaden its liability standards governing conduct after its effective date.  *See* N.Y. Exec. Law § 300.  The NYSHRL standards applied in this decision govern conduct pre-dating the amendment, which does not have retroactive effect.  *See McHenry v. Fox News Network*, LLC, No. 19 Civ. 11294 (PAE), --- F. Supp. 3d ---, 2020 WL 7480622, at *8 (S.D.N.Y. Dec. 18, 2020).

If the employer satisfies that burden, the presumption of discriminatory intent "drops out of the analysis," and "the plaintiff must establish, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination." *Lenzi*, 944 F.3d 108 (quotation and citation omitted); *see also Holt v. KMI-Cont'l, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996).  The plaintiff, however, is "not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that a prohibited factor was at least one of the 'motivating' factors" for the decision. *Holcomb*, 521 F.3d at 138 (citation omitted); *see also* 42 U.S.C. § 2000e-2(m) (race, color, or sex must be "a motivating factor" for employment decision).  However, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).  A plaintiff cannot defeat a summary judgment motion by "offering purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### 2.    NYCHRL

Claims under the NYCHRL must be analyzed separately from those under Title VII or the NYSHRL, *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), because the NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible," *Xiang v. Eagle Enters., LLC*, No. 19 Civ. 1752 (PAE), 2020 WL 248941, at *6 (S.D.N.Y. Jan. 16, 2020).  "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik*, 715 F.3d at 109.  As the Second Circuit has explained, "the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." *Id.* at 110 n.8.  Then, "the employer may present evidence of its

20

legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played *no* role in its actions." *Id.* (emphasis in original) (internal quotation marks and alterations omitted); *see also Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 114 (1st Dep't 2012) (noting applicability of *McDonnell Douglas* framework in analyzing discrimination claims under NYCHRL).

Even so, the causation inquiry under the NYCHRL "closely mirrors the questions that courts must answer when resolving summary judgment motions on Title VII claims." *Philip v. Gtech Corp.*, No. 14 Civ. 9261 (PAE), 2016 WL 3959729, at *10 (S.D.N.Y. July 20, 2016) (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 n.13 (2d Cir. 2015)); *see also Cardwell v. Davis Polk & Wardwell LLP*, No. 19 Civ. 10256 (GHW), 2020 WL 6274826, at *20 (S.D.N.Y. Oct. 24, 2020) (NYCHRL causation standard "seems to be equivalent to the 'motivating factor' standard of causation under Title VII and the NYSHRL"); *Bivens v. Inst. for Cmty. Living*, No. 14 Civ. 7173 (PAE), 2016 WL 11701799, at *1 (S.D.N.Y. Feb. 3, 2016) ("[T]he Second Circuit has continued to apply the same 'motivating factor' causation standard to employment discrimination claims under the NYCHRL that applies to equivalent claims under Title VII." (quoting *Weiss v. JPMorgan Chase & Co.*, No. 06 Civ. 4402 (DLC), 2010 WL 114248, at *3 (S.D.N.Y. Jan. 13, 2010))).

## III.   Discussion

At the threshold, the Court isolates the claims that remain to be resolved.

Beards and Berd-Vergier bring claims against BronxCare and Gates under Title VII, the NYSHRL, and the NYCHRL. *See* Compl. ¶¶ 70–81. However, although the defense has not raised the issue, Title VII does not provide for individual liability. *See Xiang*, 2020 WL 248941, at *5; *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("[I]ndividual

defendants with supervisory control over a plaintiff may not be held personally liable under Title VII."). The Court therefore dismisses the Title VII claims against Gates as a matter of law.

The NYSHRL and NYCHRL do provide for individual liability for discrimination, where the individual qualifies as an "employer" or "aided and abetted the unlawful discriminatory acts of others." *Xiang*, 2020 WL 248941, at *5. Under both statutes, the individual must have actually participated in the conduct that gave rise to the discrimination claims, but "[t]he NYCHRL provides a broader basis for direct individual liability than the NYSHRL," in that it permits liability regardless of the individual's decision-making power. *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012). Here, defendants do not dispute that the evidence permits a jury to find both that Gates was plaintiffs' supervisor, and that, if BronxCare's conduct in connection with terminating plaintiffs qualifies as actionable discrimination, Gates participated in it.

The Complaint is unclear, however, whether, in addition to claiming discriminatory terminations, plaintiffs also claim disparate treatment on account of race and religion during their employment. Reading the Complaint to possibly include such claims, defendants move against these as well as against the termination claims. In their opposition, however, plaintiffs do not claim to pursue disparate-treatment claims. Instead, they cite alleged pre-termination behavior (*e.g.*, anti-Semitic remarks) as evidence that the terminations were discriminatorily motivated and that BronxCare's stated reasons for the terminations were pretextual. Accordingly, to the extent that the Complaint may be read to include disparate-treatment claims, plaintiffs have abandoned them. *See Jackson v. Fed. Express*, 766 F.3d 189, 195, 197–98 (2d Cir. 2014) (where a party is counseled, "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned

claims").  The Court therefore grants summary judgment to defendants on any disparate-treatment claims that the Complaint may be read to contain.

Accordingly, plaintiffs' remaining claims all allege discriminatory termination on the basis of race and religion, and are under (1) Title VII, against BronxCare; and (2) the NYSHRL and the NYCHRL, against BronxCare and Gates.

## A.   Title VII and NYSHRL Claims

### 1.   *Prima Facie* Case

Defendants do not dispute that plaintiffs have satisfied the first three requirements of a *prima facie* case.  *See* Def. Mem. at 9–10.[7]  They contend only that plaintiffs have not adduced evidence sufficient to establish that plaintiffs' terminations occurred under circumstances that give rise to an inference of discrimination based on race or religion.  *See id.* at 10.

The facts required to demonstrate an inference of discrimination "inevitably vary in different employment discrimination cases."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).  The circumstances giving rise to such an inference may include "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the [adverse action]."  *Littlejohn v. City of*

---

[7] On reply, defendants argue that plaintiffs also fail to fulfill the second requirement for a *prima facie* discrimination case: that the plaintiffs were qualified for the jobs they held and were performing satisfactorily.  *See* Def. Reply at 1–3.  However, because defendants conceded that plaintiffs met the first two requirements in their opening brief, that argument is waived for the purpose of this motion.  Moreover, at the *prima facie* stage, the "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal," particularly where, as here, "discharge is at issue and the employer has already hired the employee . . . ."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001).

*New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). Where there is no direct evidence of discrimination, a plaintiff may rely on indirect or circumstantial evidence. *See Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).

The evidence plaintiffs adduce meets this minimal burden. First, plaintiffs attest that Gates made four to five derogatory statements about Jewish people and multiple statements to the effect that the BronxCare dental residency is a "residency program for minorities," and is "run by a minority, with minority faculty teaching minorities." Beards Decl. ¶ 11. Defendants dispute that these statements were made. But on a motion for summary judgment, the Court must view the evidence in the light most favorable to plaintiffs, as the non-movants, and credit that these statements were made.

Defendants argue that none of these statements are probative of discriminatory intent in connection with the termination of either defendant and that each is a stray remark, unconnected to the terminations. *See* Def. Mem. at 10–13. The Second Circuit has articulated a framework to guide courts in this District in determining whether a remark has probative value:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Here, the statements were all made by Gates, who all agree made the decisions to terminate the plaintiffs. JSF ¶¶ 30, 39. Beards does not recall the precise timing of most of the statements. But he does recall that the last one, regarding the racial composition of the dental department, was made in July 2017, approximately three months before plaintiffs were terminated. *See* Beards Decl. ¶ 11. That statement is not explicitly derogatory as to plaintiffs' race. But statements to the effect that the BronxCare dental residency program was an "all

24

minority" one could be viewed by a reasonable juror as evidencing an intent to purge non-minority dentists from the program for reasons unstated: whether out of prejudice or perhaps a programmatic preference that minority dentists serve BronxCare's patients. Defendants dispute that these remarks are probative of whether discrimination played a role in plaintiffs' terminations, noting that, as described by plaintiffs, they were made at "predetermined department-wide functions that had nothing to do with terminations," such as annual holiday parties, annual graduation parties, and one faculty meeting. *See* Def. Mem. at 12; *see also* Berd-Vergier Decl. ¶ 7; Beards Decl. ¶ 11. But these remarks, read on their faces, bear on the ideal racial composition of the department. As such, although oblique, a factfinder could connect them to the terminations of Beards and Berd-Vergier, who are white. And although the last of these remarks occurred several months before plaintiffs were terminated, these remarks were, according to plaintiffs, repeated. Gates's derogatory remarks regarding Jewish people could also reinforce an inference of discriminatory motivation. Although Beards does not remember the specifics of most such remarks, he does recall that the last was derogatory toward Jews and was made in September 2017, the month before plaintiffs were terminated. *See* Beards Decl. ¶¶ 6–8.

Defendants correctly note that stray remarks alone, even if made by a decision-maker, cannot sustain a claim of employment discrimination. *See, e.g.*, *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]uch comments, *without more*, cannot get a discrimination suit to a jury." (emphasis in original)). That argument has force. Nonetheless, the remarks here, viewed in combination with other evidence adduced, are sufficient to make the *de minimis* showing required at the *prima facie* stage that plaintiffs' terminations resulted from discrimination. *See Abdu*, 239 F.3d at 468 (decision-makers' stray remarks, when viewed in context of employer's "all-consuming interest

in the age and projected retirement rates" of employees, plaintiff has met *de minimis* burden to raise an inference of age discrimination).  In particular, plaintiffs attest that Gates actively recruited minority candidates and not white candidates, that white applicants were scrutinized more thoroughly, and that minority attending dentists, but not white ones, were hired directly from the residency program despite limited experience.  *See* Beards Decl. ¶¶ 9–10, 16.  Plaintiffs further allege that, once hired, white attending dentists, relative to minorities, had less access to residents and assistants and were given less time to complete paperwork during the day.  *See id.* ¶¶ 13–15.  To be sure, these allegations alone do not establish discriminatory animus, as these claims are generic, and plaintiffs have not identified similarly situated minority comparators to their circumstances.  *See, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  But these allegations of divergent treatment, in general, of minority versus white applicants and employed dentists are relevant context.  Combined with Gates's statements, they enable plaintiffs to clear the bar at the *prima facie* stage of supporting an inference that Gates, and hence BronxCare, acted with discriminatory intent in terminating plaintiffs.

Finally, Gates and BronxCare argue that they are entitled to a strong competing inference that they lacked discriminatory intent because Gates had hired Beards and Berd-Vergier.  *See* Def. Mem. at 16–17.  The Second Circuit has explained that, particularly where the challenged firing occurs a short time after the hiring, and the same decision-maker had both hired and fired the employee, "it is difficult to impute to [the decision-maker] an invidious motivation that would be inconsistent with the decision to hire."  *Emanuel v. Oliver, Wyman & Co., LLC*, 85 F. Supp. 2d 321, 332 (S.D.N.Y. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  In this case, however, 11 years had passed between Beards's hiring and termination, and five years had passed since Berd-Vergier's hiring.  The same-actor inference is

"less compelling when a significant period of time elapses between the hiring and firing."

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000).  Although there is no fixed

time period after which the same-actor inference ceases to apply, courts in this Circuit have

tended to find the inference weak or inapplicable once four or more years have passed.  *See, e.g.*,

*id.* (declining to apply inference where seven years passed between hiring and firing); *Ehrbar v.

Forest Hills Hosp.*, 131 F. Supp. 3d 5, 25 (E.D.N.Y. 2015) (five-year gap between hiring and

firing did not foreclose finding of discriminatory inference); *cf. Schnabel v. Abramson*, 232 F.3d

83, 91 (2d Cir. 2000) (same actor inference was "highly relevant" where three years passed

between hiring and firing).  To the extent that the inference applies here, it is sufficiently

attenuated due to the long gap between hiring and termination, particularly for Beards, and does

not preclude the inference that Gates acted with discriminatory intent in terminating plaintiffs.

### 2.     Legitimate Non-Discriminatory Reason

The Court next considers whether defendants have presented evidence of a legitimate,

non-discriminatory basis for the decision to terminate plaintiffs and not non-white and non-

Jewish candidates.  An "employer's explanation of its reasons must be clear and specific in order

to afford the employee a full and fair opportunity to demonstrate pretext."  *Byrnie v. Town of

Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (quoting *Meiri*, 759 F.2d at 996–97)

(quotation marks omitted).  Here, the evidence adduced does support non-discriminatory

justifications for each termination—for both plaintiffs, decreased productivity; and for Beards

primarily, poor attitude and problematic behavior.

As to decreased productivity, there is evidence that non-party Singh first spoke to Beards

about his productivity in 2014.  Singh notified Beards that Beards was not scheduling enough

patients.  *See* Singh Decl. ¶ 5; *id.*, Ex. A at 1 (Beards disciplinary record); Def. 56.1 ¶ 6; Pl. 56.1

¶ 6.  Between 2015 and 2016, the number of patients seen by Beards demonstrably and steeply

declined—711 in 2015, and 522 in 2016—despite Beards's continuing to work three days per week at BronxCare.  Def. 56.1 ¶¶ 8–10; Pl. 56.1 ¶¶ 8–10.  In 2017, between January 1, 2017 and the date of his termination, October 5, 2017, Beards saw only 398 patients.  Def. 56.1 ¶¶ 8–10; Pl. 56.1 ¶¶ 8–10.  At that pace, he was not on track to meaningfully outperform his 2016 productivity.  Further, as plaintiffs concede in 2016 and 2017, Beards saw fewer patients than either De La Hoz or Sheinberg, the other periodontists on staff.  *See* Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.

Berd-Vergier also saw her productivity decline in 2016 and 2017.  Between 2013 and 2015, Berd-Vergier saw an average of 1,000 patients per year, *see* Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12. But in 2016, Berd-Vergier saw only 625 patients, and in 2017, between January and October, she saw only 393 patients, which put her on a pace materially below that of 2016.  *See* Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14.

It is "widely acknowledged that reasons such as low productivity and conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge."  *Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 588 (S.D.N.Y. 2005) (quoting *Thermidor v. Beth Isr. Med. Ctr.*, 683 F. Supp. 403, 412 (S.D.N.Y.1988)); *see also Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) ("perceived lack of productivity" was a legitimate, non-discriminatory reason for employer's adverse actions); *Smooth v. Waste Mgmt.*, No. 04 Civ. 0710 (JTE), 2007 WL 642611, at *3 (W.D.N.Y. Feb. 26, 2007) (employee's low productivity compared to other drivers and failure to assist other drivers when they needed help were legitimate, non-discriminatory reasons).

Defendants separately point to evidence of uncooperative behavior and unprofessional attitudes on the part of Beards (and to a lesser degree, Berd-Vergier).  Where the evidence so establishes, such too can be a legitimate, non-discriminatory reason for plaintiffs' termination.

*See Drummond v. IPC Int'l, Inc.*, 400 F. Supp. 2d 521, 531 (E.D.N.Y. 2005) (colleting cases) (problems with personality, attitude, or inability to get along with colleagues are legitimate, non-discriminatory reasons).

Here, defendants point to evidence that other doctors complained to Rivera and Singh about Beards's and Berd-Vergier's work attitudes. *See* Rivera Decl. ¶¶ 12, 20; Singh Decl. ¶¶ 12, 15. Several attending dentists have further attested that Beards and Berd-Vergier were difficult to work with or were not team players. *See* Gates ¶¶ 9, 12; Singh ¶¶ 9, 16; M. Brown Decl. ¶¶ 7, 12; Chern-Kelk Decl. ¶¶ 5, 8; *see also Duffy v. State Farm Mut. Auto. Ins. Co.*, 927 F. Supp. 587, 594 (E.D.N.Y. 1996) (terminating plaintiff for performance issues and bad attitude where "the affidavits of numerous employees describing in detail plaintiff's unsatisfactory job performance and her bad attitude").

The evidence also substantiates that there were patient complaints about Beards's behavior (as opposed to his dental work). Beards was the subject of such a complaint about a comment he made to a patient to the effect that the patient's mouth was a "garbage can," although the parties dispute the meaning Beards intended by this metaphor. *See* Def. 56.1 ¶¶ 17–18; Singh Decl., Ex. A at 7–9 (Beards disciplinary records); Pl. 56.1 ¶¶ 17–18; Dkt. 64, Ex. 1 at 15–16 (excerpt of Beards's deposition testimony). In another complaint, a patient stated that Beards had yelled at a patient. Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.

Defendants also marshal testimony that Beards was inflexible, refusing to try to accommodate plaintiffs who came late, *see* Gates Decl. ¶ 11; Singh Decl. ¶ 13; M. Brown Decl. ¶ 8, and attempting to stop other dentists from using his residents and assistants, *see* Singh ¶ 14; Chern-Kelk Decl. ¶ 6. In summer 2017, a few months before he was terminated, Beards also engaged in a disagreement with Sullivan, who was in charge of the clinic that day in Singh's

absence, after Sullivan attempted to borrow Beards's assistant.  *See* Def. 56.1 ¶ 19; Pl. 56.1 ¶ 19.
*See also Giannone*, 392 F. Supp. 2d at 588 ("conflicts with persons in positions of authority"
provided a legitimate, non-discriminatory reason for terminating an employee).

As for Berd-Vergier, although there is less evidence of problematic attitudes, a patient
once called to lodge a complaint against Berd-Vergier, calling her "a monster."  Def. 56.1 ¶ 25;
Pl. 56.1 ¶ 25.  Defendants also fault Berd-Vergier for requesting what defendants characterize as
"special treatment," notably, asking for vacation days on days when attending dentists were not
permitted to take vacation, *see* Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30, requesting a permanent locker
despite not being a full-time employee, *see* Rivera Decl. ¶¶ 15–19, and requesting a key fob to
the administrative offices in the new building when she did not have an office in that area, *id.*[8]

### 3.     Pretext

With defendants having adduced evidence of legitimate, non-discriminatory reasons for
plaintiffs' terminations—including compelling statistical evidence of their subpar and declining
productivity—plaintiffs, to salvage their claims, must present at the third step of the *McDonnell-
Douglas* analysis "sufficient evidence to support a rational finding that the legitimate, non-
discriminatory reasons proffered by the defendant[s] were false, and that more likely than not
discrimination was the real reason for the employment action."  *Forte v. Liquidnet Holdings,
Inc.*, 675 F. App'x 21, 25–26 (2d Cir. 2017) (brackets omitted) (quoting *Weinstock*, 224 F.3d
at 42); *see also Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (admissible
evidence must show defendants' decision "more likely than not based in whole or in part on

---

[8] In a separate incident, defendants note, Chern-Kelk attested that Berd-Vergier, in an apparent
complaint, stated that "all the Jews are specialists except [Chern-Kelk]."  Chern-Kelk Decl. ¶ 9.
Defendants, however, do not supply context to make sense of this comment, and the Court is
therefore unable to assess whether it is supportive of the claim that Berd-Vergier's workplace
comportment was problematic.

discrimination" (citation omitted)).  Although plaintiffs met the *de minimis* burden of establishing a *prima facie* case that their terminations resulted from racial or religious discrimination, they have failed to establish, by a preponderance, that defendants' stated reasons were pretexts for such discrimination.

Plaintiffs have not rebutted either of the legitimate, non-discriminatory reasons that defendants identify as bases for their terminations.

Plaintiffs do not dispute the accuracy of the productivity numbers attributed to Beards and Berd-Vergier.  But they argue, for various reasons, that defendants' claim that they had subpar productivity is "highly suspect."  Pl. Opp'n at 20.

As to Beards, plaintiffs depict his productivity as not an issue until late in his tenure at BronxCare, at which point, they state, Beards faced an obstacle common to all attending dentists: a 50% patient no-show rate.  But BronxCare's high no-show rate did not affect the other two attending periodontists to the same degree as it did Beards, as their productivity, measured by the number of patients seen per day, was materially higher.  *See supra* pp. 6–8.

Beards next argues that his productivity uniquely was harmed by the 2015 decision to limit his scheduling autonomy, while understaffing residents and assistants.  *See* Beards Decl. ¶ 17.  But the evidence is undisputed that Beards's productivity problems pre-dated that point: In 2014, Singh raised the issue that Beards had been scheduling or seeing an inadequate number of patients.  Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.

Beards similarly blames BronxCare policies for his low productivity, noting that he was not assigned Spanish-speaking attendants and that, per policy, BronxCare did not call patients and remind them of their appointments.  This, too, he argues, evidences pretext.  *See* Pl. Opp'n at 22.  But, even accepting that contrary policies would have upped productivity, Beards does not

offer evidence that these policies were applied only to white and/or Jewish dentists or derived

from racial or religious animus.  These policies did not prevent Sheinberg, the other white,

Jewish periodontist on staff, from achieving substantially higher productivity.  And to the extent

that Beards identifies other dentists who were treated differently (*i.e.*, dentists who were assigned

Spanish-speaking assistants or whose patients received reminder calls), he does not identify these

dentists or show that they were similarly situated.  *See, e.g.*, *LeBlanc v. United Parcel Serv.*,

No. 11 Civ. 6983 (KPF), 2014 WL 1407706, at *15 (S.D.N.Y. Apr. 11, 2014) ("A plaintiff may

satisfy his or her burden at the pretext stage by showing that similarly situated employees outside

the protected class received more favorable treatment than the plaintiff did." (quotations and

citation omitted)).

Importantly, Beards does not identify any comparator, *i.e.*, a dentist of any other race or

religion who suffered a similar productivity drop yet was not terminated.  On the contrary, he has

not identified any dentist at BronxCare with a comparable productivity drop.  And although

comparator evidence may be used to establish pretext, such evidence cannot do so where, as

here, the plaintiff has failed to identify, let alone provide details about, ostensibly similarly

situated dentists who were not terminated for drops in productivity.  *See Desir v. Bd. of Co-op.*

*Educ. Servs. (BOCES) Nassau Cnty.*, 803 F. Supp. 2d 168, 180 (E.D.N.Y. 2011) ("Though

Plaintiff generally contends that similarly situated individuals outside of his protected class were

treated more favorably than he, Plaintiff has provided no detail about these employees, and thus

cannot establish that they were similarly situated."), *aff'd*, 469 F. App'x 66 (2d Cir. 2012); *see*

*also Fuentes v. Cablevision Sys. Corp.,* No. 14 Civ. 32 (RRM) (CLP), 2016 WL 4995075, at *7

(E.D.N.Y. Sept. 19, 2016) (at summary judgment, plaintiff cannot raise an inference of

discrimination using comparators where the plaintiff provides no "concrete facts" or details

about those comparators); *Philippe v. Santander Bank, N.A.*, No. 15 Civ. 2918 (MKB) (CLP),
2018 WL 1559765, at *15 (E.D.N.Y. Mar. 31, 2018) ("While comparator evidence may be used
to demonstrate pretext, Plaintiff fails to provide any examples of similarly situated managers
who were not terminated or punished for comparable failures . . . .") (dismissing FMLA
retaliation claim). Thus, Beards's claim that the high "no show" rates generically affected all
dentists, and therefore that defendants' productivity argument is pretextual, fails for want of a
viable comparator.

As to Berd-Vergier, plaintiffs argue that because she is the only prosthodontist, there is
no comparator for her, and thus the productivity statistics defendants adduce are "meaningless."
Pl. Opp'n at 21. But measured against her own track record, Berd-Vergier experienced a
precipitous decline in productivity beginning in 2015. *See* Def. 56.1 ¶¶ 12–14; Pl. 56.1 ¶¶ 12–14
(Berd-Vergier's productivity dropped from about 1,000 appointments per year between 2013 and
2015, to 625 in 2016, and to 393 in 2017); *see also* Singh Decl., Ex. B at 1–12 (report of Berd-
Vergier's patients seen between 2012 and 2017).

Berd-Vergier accounts for this data by contending that the number of appointments was a
function of the volume of referrals she received, which, she contends, decreased through no fault
of her own. *See* Berd-Vergier Decl. ¶¶ 12–13. But as defendants note, the data as to referrals
and appointments, although suggesting some correlation, does not by any means suggest that the
volume of referrals to Berd-Vergier dictated the number of appointments in a given year. In
2013, Berd-Vergier was referred 90 new patients and had 1,369 appointments; in 2014, she was
referred just nine fewer new patients (81) and had nearly 400 fewer (967) appointments; in 2015,
she was referred 40 new patients and the volume of appointments rose by 61 (to 1,028). *See*
Berd-Vergier Decl. ¶ 12–13; Singh Decl., Ex. B at 1–12. In 2016, she was referred four new

patients and had 625 appointments, and in 2017, she again was referred four new patients but had only 393 appointments between January 1, 2017 and her termination on October 6, 2017. *See* Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14; Singh Decl., Ex. B at 9–12. Had Berd-Vergier worked at the same productivity level for the balance of 2017, she was on track to see a personal-record low of approximately 516 patients. Even between 2016 and 2017, her productivity palpably dropped, despite having the identical number (4) of new referrals.

Importantly, however, even if defendants had incorrectly concluded on the basis of such data that plaintiffs were responsible for their declining productivity, that would not make this reason for plaintiffs' termination a pretextual cover for racial or religious discrimination. In discrimination cases, the Court is "decidedly not interested in the truth of the allegations against plaintiff," but in "what *motivated* the employer." *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)) (emphasis in *Aikens*) (quotations omitted); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11 Civ. 3625 (MKB), 2013 WL 3968748, at *13 (E.D.N.Y. July 30, 2013) ("[T]hat an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination." (citations and quotations omitted)). Plaintiffs have not come forward with any evidence that defendants' determination that their productivity had plummeted, justifying termination, was other than sincerely held. They have not, for example, identified any other attending dentist, in their specialty or otherwise, whose productivity similarly dropped yet was spared termination.

Plaintiffs have also failed to rebut the separate legitimate, non-discriminatory reason that defendants have given for their termination: plaintiffs' problematic behavior and attitudes.  As to the three complaints about Beards from his patients, Beards does not deny that these were received.  He claims only that the complaints were unfair or unfounded.  Pl. Opp'n at 23–24. That does not establish pretext.  *See Johnson v. MacDonald*, 897 F. Supp. 2d 51, 75 (E.D.N.Y. 2012) (plaintiff failed to demonstrate that employer's reason, that the plaintiff had received numerous customer complaints, was pretextual where plaintiff conceded that allegations were made and contested only that the complaints were merited), *aff'd sub nom. Johnson v. Just Energy*, 547 F. App'x 71 (2d Cir. 2013).  Berd-Vergier argues that, as to the complaint against her in 2015, Gates testified that he found no fault with her work.  *See* Pl. Opp'n at 23.  But Gates also testified that the complaint itself presented a problem because "[BronxCare] had an unhappy patient who happened to be a member of the Board of Trustees," and that he, Gates, "was getting phone call[s] finding out why a member of the Board of Trustees was so unhappy."  Bauer Decl., Ex. 8 at 86.

As to defendants' claims to have terminated plaintiffs for the additional reason that other attending dentists found them difficult to work with, plaintiffs note their years of consistently positive performance reviews.  *See* Bauer Decl., Ex. 1 (Beards's performance evaluations for 2014 and 2016 conducted by Gates, and one undated evaluation); *id.*, Ex. 2 (resident feedback of Beards from 2014–2017); *id.*, Ex. 3 (Berd-Vergier's 2013, 2014, and 2016 performance evaluations conducted by Gates, and one undated evaluation); *id.*, Ex. 4 (Berd-Vergier residents' reviews for 2014–2017).  These reviews are indeed favorable.  At the same time, they do not purport to be comprehensive, and demonstrably are not, as none chronicle the patient complaints that BronxCare received.  More important, plaintiffs do not address the multiple declarations

filed in this action, some by white, Jewish attendings, to the effect that plaintiffs were difficult to work with, and that such had been reported to Gates.  *See* Gates ¶¶ 9, 12; Singh ¶¶ 9, 16; M. Brown Decl. ¶¶ 7, 12; Chern-Kelk Decl. ¶¶ 5, 8.  Sullivan, for example, complained about Beards's behavior after the two engaged in a disagreement over the use of Beards's assistant. *See* Def. 56.1 ¶¶ 19–20; Pl. 56.1 ¶¶ 19–20.  Complaints from coworkers about poor attitude or collegiality can constitute a legitimate and non-discriminatory basis for a termination.  *See Drummond*, 400 F. Supp. 2d at 531; *Duffy*, 927 F. Supp. at 594.

Notably, plaintiffs do not claim, and the record would not permit them credibly to do so, that these coworkers fabricated these grievances.  Indeed, plaintiffs do not contend, factually, that their relationships with other attending dentists were free from discord.  On the contrary, they acknowledge that Beards clashed with others about rooms and residents.  *See* Pl. Opp'n at 24.  Beards instead urges that the fault for these conflicts lies with his colleagues.  But as explained, the issue as to pretext is what motivated defendants in firing Beards, not whether defendants accurately faulted him, as opposed to his antagonists, in connection with workplace disputes.  *See McPherson*, 457 F.3d at 216.  Here, too, plaintiffs have not adduced any evidence that any attending dentist from a different ethnicity or religion had similar friction with colleagues yet was spared termination.

In arguing pretext, plaintiffs return to the statements by decision-maker Gates, on the basis of which the Court found a sufficient *prima facie* case, about the composition of the program, to wit, that the BronxCare dental residency was a "residency program for minorities," "run by a minority, with minority faculty teaching minorities."  Beards Decl. ¶ 11.  But at the pretext stage, the presumption of discriminatory intent "drops out of the analysis."  *Lenzi*, 944 F.3d at 108.  And, for several reasons, these comments, viewed in full context, do not establish

by a preponderance of the evidence that Gates's stated reasons for the terminations were pretexts

for discrimination.

First, although Gates was the ultimate decision-maker, it is undisputed that all three other

members of the Management Council—Singh, Rivera, and Carcamo—recommended that both

Beards and Berd-Vergier be terminated.  *See* Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.  Where multiple

evaluators express dissatisfaction with an employee's performance, that undercuts the inference

that the ultimate decision-maker acted out of discrimination.  *See Sotomayor v. City of New York*,

862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  Plaintiffs counter

by impugning Singh as also harboring discriminatory animus, based on Beards's testimony that

Singh once said in a "derogatory tone" that "no accommodation should be made [for an orthodox

Jewish candidate], and that the candidate should apply somewhere else."  Beards Decl. ¶ 10.

That stray remark has little probative value.  Plaintiffs do not explain when Singh said this, let

alone connect it to the termination of either plaintiff.  Plaintiffs, tellingly, do not attribute any

discriminatory or derogatory remarks to Rivera or Carcamo.

Second, Gates ultimately replaced both plaintiffs, in part, with members of the same

protected class.  That undercuts any discriminatory inference.  *See White v. Pacifica Found.*, 973

F. Supp. 2d 363, 381 (S.D.N.Y. 2013); *see also Montanile v. Nat'l Broadcast Co.*, 211 F. Supp.

2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class

weighs heavily against the inference that she suffered discrimination."), *aff'd*, 57 F. App'x. 27

(2d Cir. 2003).  To be sure, as plaintiffs note or contend, they were not entirely replaced by

individuals in their same class.  Beards was replaced by Gates's increasing the hours of both De

La Hoz and Sheinberg, the other two periodontists on staff, by one day each, *see* Def. 56.1 ¶ 37;

Pl. 56.1 ¶ 37; Rivera Decl. ¶¶ 32–33, of whom Sheinberg, like Beards, is white and Jewish, *see*

Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.  Berd-Vergier contends that she was not initially replaced by Jerry

Brown, a white, Jewish prosthodontist, but by Rick Adams, an African-American generalist

dentist who already worked for BronxCare.  In support, however, she cites only her EEOC

complaint so stating.  *See* EEOC Resp. at 2.  But it is inadmissible hearsay, *see Mazza v. Bratton*,

108 F. Supp. 2d 167, 171 (E.D.N.Y. 2000), *aff'd*, 9 F. App'x 36 (2d Cir. 2001), not properly

considered on a motion for summary judgment, *see Barkley v. Penn Yan Cent. Sch. Dist.*, 442 F.

App'x 581, 585 (2d Cir. 2011) (citing Fed. R. Civ. P. 56(c)(4)).  Berd-Vergier does not attest to

the truth of this statement that Adams replaced her in her affidavit, or otherwise offer admissible

evidence to this effect.[9]  In any event, even were this proposition supported by admissible

evidence, Berd-Vergier acknowledges that Adams is not a prosthodontist by training and that

BronxCare required a prosthodontist on staff.  *See* EEOC Resp. at 2.  Accordingly, a rational

juror could not conclude that, whatever role Adams may have played in the immediate aftermath

of Berd-Vergier's termination, Adams was intended to permanently assume Berd-Vergier's role

as attending prosthodontist.

 Finally undermining a discriminatory inference is that Gates fired two non-white, non-

Jewish attending physicians the same year as he terminated plaintiffs.  Plaintiffs emphasize that

they were fired a day apart, but the same year, Gates fired Gomez and Pong, both of whom the

parties concede are non-white and non-Jewish.  Def. 56.1 ¶¶ 41–44; Pl. 56.1 ¶¶ 41–44.  Insofar

as plaintiffs posit that Gates terminated plaintiffs to increase the number of minority attending

personnel, Gates's termination of minorities who held that post tends to undermine that

---

[9] In its response to Berd-Vergier's EEOC complaint, which is admissible as a statement of a
party opponent, BronxCare denied filling Berd-Vergier's "position" or "line of service" with
Adams.  EEOC Resp. at 2.  Rather, BronxCare contended there, Adams is a general dentist with
experience in prosthodontics who, like other general dentists, would assist on patient cases
requiring prosthodontics "as needed."  *Id.*

inference.  It is, further, undisputed that plaintiffs are the only two white, Jewish plaintiffs Gates terminated in his 29 years as chair of BronxCare's dental department.

Viewing the evidence in full, plaintiffs therefore have not mustered sufficient evidence on which to conclude that BronxCare and Gates acted with discriminatory animus in terminating them, and that the legitimate, non-discriminatory reasons offered by defendants are pretext for discrimination.  Accordingly, the Court grants defendants' motion for summary judgment on plaintiff's claims for race and religious discrimination under Title VII and the NYSHRL.

## B.    NYCHRL Claims[10]

Defendants also move for summary judgment as to plaintiffs' claims under the NYCHRL.  The standard for a *prima facie* case under the NYCHRL is more relaxed than its counterparts under Title VII and the NYSHRL.  To show adverse action, a "plaintiff must simply show that he was treated differently from others in a way that was more than trivial, insubstantial, or petty."  *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015) (citations and quotations omitted).  And as to the requirement that the plaintiffs show that the adverse action occurred under circumstances giving rise to an inference of discrimination, "the

---

[10] Some New York State appellate divisions have challenged whether the traditional *McDonnell-Douglas* framework governs claims brought under the NYCHRL.  *See Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 121 (1st Dep't 2011) (on summary judgment motion, defendant bears the burden of showing that "no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence"); *see also Persaud v. Walgreens Co.*, 161 A.D.3d 1019, 1020 (2d Dep't 2018) ("Summary judgment dismissing a claim under the NYCHRL should be granted only if no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, direct evidence, or some combination thereof." (citations and quotations omitted)).  *Bennett* to date has not been adopted by the New York Court of Appeals or the Second Circuit.  *See Hofmann v. Schiavone Contracting Corp.*, 630 F. App'x 36, 39 (2d Cir. 2015) (acknowledging that extent to which *McDonnell-Douglas* applies to NYCHRL claims is "unclear" after *Bennett*, but declining to resolve the issue).  The Court need not resolve this split because, under any of these frameworks, plaintiffs have not raised a triable issue of fact that defendants' stated reasons for terminating plaintiffs were pretextual.

*prima facie* case is satisfied if a member of a protected class was treated differently than a worker who was not a member of that protected class." *Id.* (citations and quotations omitted).

For the same reasons that plaintiffs have satisfied the more stringent test for a *prima facie* case of discrimination under Title VII and the NYSHRL, they have they made out a *prima facie* case under the NYCHRL. *See supra* pp. 22–26. Nonetheless, summary judgment on a claim under the NYCHRL "is appropriate if the record establishes as a matter of law that discrimination or retaliation played no role in the defendant's actions." *Montgomery v. N.Y.C. Transit Auth.*, 806 F. App'x 27, 31 (2d Cir. 2020) (summary order). Such is the case here. For the reasons reviewed above, plaintiffs have failed to adduce evidence that would permit a reasonable juror to find that, in connection with their terminations, plaintiffs were treated less well than attending dentists belonging to other racial or religious groups. And, for the reasons reviewed, there is substantial neutral evidence supporting the first non-discriminatory reasons articulated by defendants as the bases for terminating Beards and Berd-Vergier: that each's productivity had markedly declined. And while Beards claims BronxCare's high no-show rate is to blame for this decline, he does not address why other periodontists, including one white, Jewish periodontist, did not experience similar productivity drops. Nor has he come forward with viable evidence explaining why the BronxCare policies that he faults for his productivity lapses were motivated by racial or religious discrimination or would be expected to disparately affect white and/or Jewish attending dentists. Berd-Vergier, the sole prosthodontist, similarly also saw her productivity drop sharply, and she, too, cannot attribute this fact to discrimination. As for defendants' separate stated basis for terminating the two plaintiffs—their problematic workplace attitudes and comportments—such was attested to by multiple non-party witnesses such as fellow attending dentists, and there had been several patient complaints as Beard, and

one as to Berd-Vergier.  Plaintiffs have not adduced any evidence ascribing these events to racial or religious discrimination.

In sum, plaintiffs have not adduced evidence to raise a triable issue of fact that plaintiffs were terminated as a result of unlawful discrimination of any kind.  Accordingly, the Court must also grant defendants' motion for summary judgment on plaintiffs' claims for racial and religious discrimination under the NYCHRL.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment. The Clerk of Court is respectfully directed to terminate the motion pending at docket 41 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: February 23, 2021
      New York, New York